IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

MARATHON RESOURCE
MANAGEMENT GROUP, LLC.,

   Plaintiff,

v.              Civil Action No. 3:19cv89

C. CORNELL, INC. D/B/A CERTA PRO
PAINTERS OF COLLEGE STATION,

   Defendant.

## MEMORANDUM OPINION

This matter comes before the Court on Defendant C. Cornell, Inc. d/b/a Certa Pro

Painters of College Station's ("Certa Pro") Motion to Dismiss brought pursuant to Federal

Rule of Civil Procedure 12(b)(2)[1] and 12(b)(6)[2] (the "Motion to Dismiss"). (ECF No. 15.)

Plaintiff Marathon Resource Management Group, LLC ("Marathon") responded, (ECF No.

18),[3] and Certa Pro replied, (ECF No. 20). Marathon also filed a Request for Entry of Default

---

[1] Rule 12(b)(2) allows dismissal for "lack of personal jurisdiction." Fed. R. Civ. P. 12(b)(2). Although Certa Pro does not explicitly refer to Rule 12(b)(2) in its Motion to Dismiss, it contends that the Court does not possess personal jurisdiction over it. As explained in further detail below, the Court does not reach this argument and assumes, for the purpose of deciding the Motion to Dismiss only, that it possesses personal jurisdiction over Certa Pro.

[2] Rule 12(b)(6) allows dismissal for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).

[3] Marathon filed a Response to the Motion to Dismiss, as well as a Memorandum in Response to the Motion to Dismiss. (ECF No. 19.) When referencing Marathon's responses to the Motion to Dismiss, the Court will cite to the arguments contained within its Memorandum in Response.

Judgment (the "Motion for Default"), (ECF No. 21), and Marathon filed a Motion for a Hearing, (ECF No. 25).[4]

These matters are ripe for disposition. The Court dispenses with oral argument because the materials before it adequately present the facts and legal contentions, and argument would not aid the decisional process. The Court exercises jurisdiction pursuant to 28 U.S.C. § 1332(a).[5] For the reasons that follow, the Court will grant Certa Pro's Motion to Dismiss for failure to state a claim under Rule 12(b)(6).

### I. Factual and Procedural Background

This breach of contract action arises out of a default judgment that Certa Pro obtained against Marathon in the District Court of Brazos County, Texas (the "Texas Court") for unpaid

---

[4] The Court will deny both the Motion for Default and the Motion for a Hearing. In the Motion for Default, Marathon states that Certa Pro "failed to properly set this motion for hearing in compliance with Local Civil Rule 7(E)." (Mot. Def. 1–2, ECF No. 21.) Certa Pro filed a response to the Motion for Default, (ECF No. 23), and Marathon replied, (ECF No. 24).
   Local Rule 7(E) for the United States District Court for the Eastern District of Virginia provides in pertinent part:

> The moving party shall be responsible to set the motion for hearing or to arrange with opposing counsel for submission of the motion without oral argument. Unless otherwise ordered, a motion shall be deemed withdrawn if the movant does not set it for hearing (or arrange to submit it without a hearing) within thirty (30) days after the date on which the motion is filed.

E.D. Va. Loc. Civ. R. 7(E). Certa Pro contacted the undersigned's chamber to request a hearing on the pending Motions to Dismiss, but the undersigned declined to set a hearing at that time. Therefore, Certa Pro fulfilled its obligations as to the Motion to Dismiss and the Court may properly consider its arguments. For this reason and, because the materials before it adequately present the facts and legal contentions, the Court will deny the Motion for Default and the Motion for a Hearing.

[5] "The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between . . . citizens of different States." 28 U.S.C. § 1332(a). Marathon is a citizen of Virginia, Certa Pro is a citizen of Texas, and the Complaint alleges damages exceeding $75,000.

painting and cleaning services (the "Texas Lawsuit"). Marathon alleges that Certa Pro's suit violated a mandatory forum selection clause in a Master Service Agreement (the "MSA") between the two Parties. Because the Texas Lawsuit is integral to Marathon's Complaint, the Court will discuss that lawsuit before turning to Marathon's factual allegations.

### A.   Underlying Texas Lawsuit

On January 30, 2018, Certa Pro brought suit against Marathon in the Texas Court seeking to recover money for unpaid painting services. In the Texas Lawsuit, Certa Pro alleged that in May 2017, it entered into two separate contracts with Marathon for Certa Pro to paint and clean rooms in a building located in College Station, Texas. (Compl. Ex. B "Certa Pro Texas Complaint" 3, ECF No. 1-2.)[6] Certa Pro completed the work and submitted two invoices to Marathon: (1) on August 22, 2017, Certa Pro sent Marathon an invoice for $29,578.00 for the painting services; and, (2) on September 11, 2017, Certa Pro alleged that it sent an invoice for $11,280.00 for the cleaning services.[7] (*Id.*) Marathon did not pay either of the invoices, and Certa Pro filed suit in the Texas Court. (*Id.* 4.)

On March 22, 2018, the Texas Court issued a default judgment against Marathon (the "Texas Default Judgment"). (Texas Court Default Judgment.) The Texas Court found that

---

[6] Because Certa Pro removed this case, Certa Pro appended the Complaint and all its exhibits to its Notice of Removal. For ease of reference, the Court will refer to documents attached to the Complaint.

[7] The Texas Complaint states that Certa Pro submitted to Marathon an invoice for the cleaning services for $11,280.00 on September 11, 2017. (Certa Pro Texas Compl. 3.) Neither Party addresses, however, that Certa Pro submits an invoice to this Court, dated August 22, 2017, for $12,360.00 appearing to request payment for the same or similar cleaning services. (Not. Removal Ex. C "Cleaning Invoice" 26, ECF No. 1-3.) Given that the Texas Default Judgment, (Compl. Ex. C "Texas Court Default Judgment," ECF No. 1-2), flows from a complaint alleging the *lower* $11,280.00 monetary figure, (Certa Pro Texas Compl. 3), this difference is of no moment.

3

Marathon "was served through the Texas Secretary of State" but failed to appear or answer Certa

Pro's complaint. (*Id.* 1.) The Texas Court authorized Certa Pro to collect $40,263.00 for its

breach of contract claim; $15,000.00 in reasonable attorneys' fees; pre and post-judgment

interest; and, the costs of the suit. (*Id.* 2.) On August 31, 2018, the District Clerk for the Texas

Court issued a Writ of Garnishment After Judgment to CLS Inc. (the "Writ of Garnishment").

(Compl. Ex. D "Writ of Garnishment," ECF No. 1-2.)

### B.    Factual Allegations[8]

On December 20, 2018, Marathon filed suit against Certa Pro in the Circuit Court for the

City of Richmond (the "Richmond Circuit Court"). Marathon asserts that on September 22,

2017, Certa Pro "freely . . . entered into [the MSA] with [Marathon]." (Compl. ¶ 11, ECF No. 1-

2.) On September 23, 2017, Certa Pro allegedly "signed and returned the same MSA, making it

a fully executed contract."[9] (*Id.* ¶ 14.) The MSA stated that "[t]he validity, construction,

interpretation, performance, and jurisdictional venue pertaining to this [MSA] shall be governed

and construed in accordance with the laws of Virginia" and that the Richmond Circuit Court had

"personal jurisdiction" over Certa Pro. (*Id.* ¶¶ 9–10; *see also* Compl. Ex. A "Master Subcontract

Agreement [MSA]" § 30, ECF No. 1-2.) Under the terms of the MSA, Certa Pro could not

engage "in non-authorized communication with [Marathon's] customers." (Compl.

---

[8] Rule 12(b)(6) allows dismissal for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). For the purpose of the Rule 12(b)(6) Motion to Dismiss, "a court 'must accept as true all of the factual allegations contained in the complaint' and 'draw all reasonable inferences in favor of the plaintiff.'" *Kensington Volunteer Fire Dep't, Inc. v. Montgomery Cty., Md.*, 684 F.3d 462, 467 (4th Cir. 2012) (quoting *E.I. du Pont de Nemours & Co. v. Kolon Indus.*, 637 F.3d 435, 440 (4th Cir. 2011)).

[9] According to the dates listed for the painting and cleaning invoices in the Certa Pro Texas Complaint, the September 22, 2017 MSA followed Certa Pro's $29,578.00 College Station painting invoice by nearly one month, and its $11,280.00 cleaning invoice by nearly two weeks. (Certa Pro Texas Compl. 3.)

4

¶ 24.) Marathon recounts that Certa Pro filed suit against Marathon on January 30, 2018 in the Texas Court, (*id.* ¶ 15), and obtained a default judgment against Marathon on March 22, 2018, (*id.* ¶ 20).

Marathon's Complaint brings two claims for breach of contract. First, Marathon asserts that Certa Pro "has never agreed to resolving any dispute in any jurisdiction or venue other than those explicitly stated in the MSA." (*Id.* ¶ 21.) Therefore, Marathon maintains that Certa Pro's filing of the Texas Lawsuit sought "dispute resolution outside of the contractually agreed upon forum" and violated the forum selection clause of the MSA. (*Id.* ¶ 22.) Second, Marathon claims that Certa Pro "freely and willfully . . . contacted a customer of [Marathon]" when the District Clerk of the Texas Court issued the Writ of Garnishment for the Texas Default Judgment to CLS Inc., one of Marathon's customers. (*Id.* ¶ 25; Writ of Garnishment.) Marathon claims this "non-authorized communication with a customer . . . constitutes a material breach of contract." (Compl. ¶ 28.)

### C.   **Procedural Background**

On December 20, 2018, Marathon filed its Complaint in the Richmond Circuit Court. Certa Pro removed the matter to this Court, (Not. Removal, ECF No. 1), and Marathon filed a Motion to Remand on March 4, 2019, (ECF No. 6). On October 25, 2019, this Court issued a Memorandum Opinion and Order finding removal proper and denying the Motion to Remand. (Oct. 25, 2018 Mem. Op. & Order, ECF Nos. 12, 13.)

The Court turns to the instant Motion to Dismiss. Because Marathon does not raise a plausible claim that the terms of the MSA applied to the previous work Certa Pro performed for Marathon in Texas, the Court will grant the Motion to Dismiss under Rule 12(b)(6).

5

## II.  Standards of Review

### A.    Rule 12(b)(6)

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) (citing 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1356 (1990)). To survive Rule 12(b)(6) scrutiny, a complaint must contain sufficient factual information to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also* Fed. R. Civ. P. 8(a)(2) ("A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief."). Mere labels and conclusions declaring that the plaintiff is entitled to relief are not enough. *Twombly*, 550 U.S. at 555. Thus, "naked assertions of wrongdoing necessitate some factual enhancement within the complaint to cross the line between possibility and plausibility of entitlement to relief." *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (internal quotation marks omitted).

A complaint achieves facial plausibility when the facts contained therein support a reasonable inference that the defendant is liable for the misconduct alleged. *Twombly*, 550 U.S. at 556; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This analysis is context-specific and requires "the reviewing court to draw on its judicial experience and common sense." *Francis*, 588 F.3d at 193. The Court must assume all well-pleaded factual allegations to be true and determine whether, viewed in the light most favorable to the plaintiff, they "plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 676–79; *see also Kensington*, 684 F.3d at 467 (finding that the court in deciding a Rule 12(b)(6) motion to dismiss "must accept as true all of

6

the factual allegations contained in the complaint' and 'draw all reasonable inferences in favor of

the plaintiff'" (quoting *Kolon Indus., Inc.*, 637 F.3d at 440)). This principle applies only to

factual allegations, however, and "a court considering a motion to dismiss can choose to begin

by identifying the pleadings that, because they are no more than conclusions, are not entitled to

the assumption of truth." *Iqbal*, 556 U.S. at 679.

      "Although a motion pursuant to Rule 12(b)(6) invites an inquiry into the legal sufficiency

of the complaint, not an analysis of potential defenses to the claims set forth therein, dismissal

nevertheless is appropriate when the face of the complaint clearly reveals the existence of a

meritorious affirmative defense." *Occupy Columbia v. Haley*, 738 F.3d 107, 116 (4th Cir. 2013)

(quoting *Brockington v. Boykins*, 637 F.3d 503, 506 (4th Cir. 2011)).

### B.    Effect of Extrinsic Documents

     "If, on a motion under Rule 12(b)(6) . . . , matters outside the pleadings are presented to

and not excluded by the court, the motion must be treated as one for summary judgment under

Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that

is pertinent to the motion." Fed. R. Civ. P. 12(d); *see Laughlin v. Metro. Wash. Airports Auth.*,

149 F.3d 253, 260–61 (4th Cir. 1998); *Gay v. Wall*, 761 F.2d 175, 177 (4th Cir. 1985). However,

"a court may consider official public records, documents central to plaintiff's claim, and

documents sufficiently referred to in the complaint [without converting a Rule 12(b)(6) motion

into one for summary judgment] so long as the authenticity of these documents is not disputed."

*Witthohn v. Fed. Ins. Co.*, 164 F. App'x 395, 396–97 (4th Cir. 2006) (citations omitted); *see also*

*Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016) (reiterating that the Court

may also properly "consider documents that are explicitly incorporated into the complaint by

reference . . . and those attached to the complaint as exhibits"). "[I]n the event of conflict

7

between the bare allegations of the complaint and any attached exhibit . . . , the exhibit prevails."
*Fayetteville Inv'rs v. Commercial Builders, Inc.*, 936 F.2d 1462, 1465 (4th Cir. 1991).

### III. Analysis: Extrinsic Documents

The United States Court of Appeals for the Fourth Circuit long has recognized that a

court may properly consider documents "attached to the motion to dismiss, so long as they are

integral to the complaint and authentic." *Philips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 180

(4th Cir. 2009). With encouragement from the parties, the Court will consider six documents in

resolving the Motion to Dismiss. First, Marathon attaches four documents to its Complaint:

(1) the MSA;[10] (2) Certa Pro's Texas Complaint; (3) the Default Judgment in the Texas Court;

and, (4) the Texas Writ of Garnishment. (*See* Compl. Exs. A–D, ECF No. 1-2.) Because the

Court may "consider documents that are explicitly incorporated into the complaint by reference .

. . and those attached to the complaint as exhibits," *Goines*, 822 F.3d at 166, the Court will

consider the four initial attachments to the Complaint, as well as the COI and W-9,[11] when

deciding the Motion to Dismiss.

In addition, both Parties place in the record copies of the "Scope of Work & Pricing

Agreement[s]" covering work in College Station, Texas: (1) the painting services Certa Pro

performed for Marathon (the "Painting Contract") signed by Certa Pro on May 24, 2017; and, (2)

the cleaning services Certa Pro performed for Marathon between August 1 and August 15, 2017

---

[10] The MSA references sub-exhibits, including "Exhibit A[:] Subcontractor's Certificate
of Insurance" and "Exhibit B[:] W-9." (*See* MSA 4, 30, 31.) Marathon attaches full copies of
the Subcontractor's Certificate of Insurance ("COI") and the W-9 to its Memorandum in
Response to the Motion to Dismiss. (*See* Mem. Resp. Mot. Dismiss Exs. 3–4, ECF Nos. 19-3,
19-4.)

[11] Although Marathon did not originally attach the COI and W-9 to the Complaint, they
are explicitly identified as attachments to the MSA at the core of Marathon's Complaint. As
explained later, the Court will consider these documents during its analysis.

(the "Cleaning Contract") signed by Certa Pro on August 2, 2017. (*See* Not. Removal Ex. 1 "Affidavit of Cliffton C. Cornell" Exs. A–B, ECF No. 1-3; Mem. Resp. Mot. Dismiss Exs. 1–2, ECF No. 19.) Because both Parties provide copies of the Painting and Cleaning Contracts to the Court, and these copies match, no party can reasonably dispute, nor does dispute, their "authenticity." *Witthohn*, 164 F. App'x at 396–97.

Certa Pro brought the Texas Lawsuit to enforce the terms of the Painting and Cleaning Contracts. As such, those contracts (and whether the MSA superseded their terms and conditions) are "integral" to Marathon's claim that the Texas Lawsuit violated the MSA. *See, e.g., Prince George's Cty. v. Wells Fargo & Co.*, 397 F. Supp. 3d 752, 765 (D. Md. 2019) ("[c]ourts have found integral . . . documents that constitute the core of the parties' contractual relationship in a breach of contract dispute" (internal citations omitted)). Indeed, they are not just integral, they underlie the dispute at bar. Marathon contends that the MSA incorporated the Painting and Cleaning Contracts, (Mem. Resp. Mot. Dismiss 3), thus rendering Certa Pro's Texas Lawsuit to collect payment for those services in violation of the MSA's forum selection clause. Certa Pro, on the other hand, contends the MSA did not alter those previous contracts. (Mem. Supp. Mot. Dismiss 6, ECF No. 16; Reply Mot. Dismiss 5–6.) Because the Painting and Cleaning Contracts are "integral to the complaint" and neither party disputes their authenticity, the Court will consider them when deciding the Motion to Dismiss. *Witthohn,* 164 F. App'x at 396–97; *see also Philips*, 572 F.3d at 180.

The Court now turns to the substance of the Certa Pro's Motion to Dismiss. Considering the Complaint and the attached documents, Marathon has failed to state a claim on which relief can be granted.

## IV. Analysis:  Breach of the Forum Selection Clause

The Court will grant Certa Pro's Motion to Dismiss Count I for the alleged breach of the

MSA's forum selection clause.  As this Court observed in its October 25, 2019 Memorandum

Opinion, "[n]othing in the MSA supports the unusual position that its terms would apply to

services completed before execution of the MSA." (Oct. 25, 2019 Mem. Op. 3 n.5, ECF No. 12.)

That observation holds true here.  Because Marathon has failed to allege sufficient facts to raise a

plausible inference that the MSA governed the prior contractual dealings between Certa Pro and

Marathon, Marathon has failed to state a claim for breach of the MSA's forum selection clause.[12]

The Court turns first to the plain language of the MSA, concluding that the contract

applies only to future work, not to the previous contractual arrangements or prior work between

Marathon and Certa Pro.[13]  Next, despite Marathon's bare factual assertions to the contrary, the

Court determines that because the MSA did not apply to the previous work Certa Pro performed

---

[12] Certa Pro raises several other arguments in their Motion to Dismiss, including that:
(1) this Court does not have personal jurisdiction over Certa Pro; (2) Marathon's claims
constitute a collateral attack on the Texas Court's judgment and are barred by the Full Faith and
Credit Clause of the United States Constitution; and, (3) Marathon's claims are barred by *res
judicata* and claim preclusion under Virginia law. (*See* Mem. Supp. Mot. Dismiss.)  Because the
Court concludes that Marathon does not state a claim for breach of contract under the plain
language of the MSA, the Court need not reach these alternative arguments.

[13] The Court assumes, solely for the purposes of the Motion to Dismiss, that the MSA is
authentic and that both Marathon and Certa Pro assented to its terms.  Certa Pro, however,
disputes the authenticity of the MSA.  Certa Pro's President and Director, Clifton C. Cornell,
whose signature and initials seem to appear on the MSA, submitted an affidavit swearing he
never received the MSA and never signed it. (Cornell Aff. 3.)  He states: "[t]here are no other
[Certa Pro] employees or agents who could have signed or docusigned the MSA other than me."
(*Id.*)  Because the Court determines that Marathon has not stated a claim pursuant to Rule
12(b)(6), it need not resolve the factual dispute as to whether Cornell or Certa Pro assented to the
MSA.

10

for Marathon, Certa Pro did not breach the MSA when it filed the Texas Lawsuit to collect payment.

A.      **Legal Standard:  Principles of Contract Interpretation Under Virginia Law**[14]

The principles governing contract interpretation in the Commonwealth of Virginia are well established. *Wood v. Symantec Corp.*, 872 F. Supp. 2d 476, 481 (E.D. Va. 2012). "Under Virginia law, '[c]ontracts are construed as written, without adding terms that were not included by the parties.'" *Harris v. Mariner Fin. LLC*, No. 3:18cv588, 2019 WL 4060336, at *7 (E.D. Va. Aug. 28, 2019) (quoting *TM Delmarva Power, L.L.C. v. NCP of Va., L.L.C.*, 557 S.E.2d 199, 200 (Va. 2002)).  When the language of a contract is "clear and unambiguous, the contract must be construed according to its plain meaning." *Parikh v. Family Care Ctr., Inc.*, 641 S.E.2d 98, 100 (Va. 2007); *see also Pac. Ins. Co. v. Am. Nat'l Fire Ins. Co.*, 148 F.3d 396, 405 (4th Cir. 1998) ("Virginia strictly adheres to the 'plain meaning' rule, entitling the parties to rely on the express terms of the written agreement").  "Importantly, '[w]ords that the parties used are normally given their usual, ordinary, and popular meaning.'" *Chesapeake Bay Enters., Inc. v. Chesapeake Tr.*, No. 3:15cv35, 2015 WL 5786831, at *3 (E.D. Va. Sept. 30, 2015) (quoting *D.C. McClain, Inc. v. Arlington Cty.*, 452 S.E.2d 659, 662 (Va. 1995)).  "No word or clause in the contract will be treated as meaningless if a reasonable meaning can be given to it, and there is a presumption that the parties have not used words needlessly." *Id.*

Where possible, the "court must read the contract as a single document, the meaning of which is gathered from all its associated parts when assembled as the unitary expression of the

---

[14] The MSA states that "[t]he validity, construction, interpretation, performance, and jurisdictional venue pertaining to this [MSA] shall be governed and construed in accordance with the laws of the Commonwealth of Virginia." (MSA § 30.)  Because, for the purposes of this Motion to Dismiss, the Court assumes both Parties assented to the MSA, the Court will apply Virginia law.

agreement of the parties." *First Am. Title Ins. Co. v. Seaboard Savs. & Loan Ass'n.*, 315 S.E.2d

842, 845 (Va. 1984) (internal citations omitted).  Courts must look to "the intention of the parties

as expressed by them in the words they have used, and . . . are bound to say that the parties

intended what the written instrument plainly declares." *Meade v. Wallen*, 311 S.E.2d 103, 104

(Va. 1984) (internal citations omitted).

"To state a claim for breach of contract under Virginia law, a plaintiff must plausibly

allege in federal court:  (1) a legally enforceable obligation of a defendant to a plaintiff; (2) the

defendant's violation or breach of the obligation; and, (3) an injury or harm caused by the

defendant's breach." *Hardnett v. M&T Bank*, 204 F. Supp. 3d 851, 860 (E.D. Va. 2016) (citing

*Filak v. George*, 594 S.E.2d 610, 614 (Va. 2004)).

> **B.     The Plain Language of the MSA Demonstrates That the Parties Intended Its
> Restrictions and Conditions, Including the Forum Selection Clause, to Apply
> Only to Future Work**

The plain language of the MSA unambiguously demonstrates that the Parties did not

intend its terms to cover past work or contractual dealings between them. Marathon relies

heavily on the language of the MSA to support its claim that Certa Pro breached the MSA's

forum selection clause when it filed the Texas Lawsuit to collect on the Painting and Cleaning

Contracts. (Mem. Resp. Mot. Dismiss 3–6.)  But a plain reading of the contractual terms shows

that the MSA applies only to future work.  The Court rests this finding on three observations.

First, the MSA's repeated use of the word "shall" (and not the past tense "shall have")

demonstrates the Parties' intention for the MSA to apply to future work.  Second, the Court

observes that the MSA, although it explicitly incorporated other outside documents, did not

incorporate the then extant Painting and Cleaning Contracts, leading to the reasonable inference

that the MSA did not supersede or alter the Painting and Cleaning Contracts.  Third, the wording

and structure of the insurance provision in the MSA also evinces the Parties' intention that the
MSA apply to future, not past, work.

> **1.     The MSA's Repeated Use of the Word Shall Shows That the MSA
> Applied Only to Future Work Under the Contract**

The MSA's repeated use of the word "shall"—while not using the past tense "shall

have"—demonstrates that the Parties intended the MSA to apply to future business dealings

only. On the first page, in defining the responsibilities of Certa Pro under the MSA, the MSA

states that Certa Pro:

> *shall* perform the work at the Subcontract Amount and by the work completion date
> more particularly described in a Work Order, as modified pursuant to change orders
> entered into as described by the terms of Article 17 of this [MSA], and as otherwise
> described in this Master Subcontract (hereinafter referred to as "Work").

(MSA § 1.1 (emphasis added).)  Under this definition, the MSA defines the "Work" in distinctly

forward-looking terms. (*Id.*)  The MSA states that Certa Pro "shall" perform the "Work." (*Id.*)

No suggestion exists that the "Work" includes prior contractual dealings between the Parties.

Indeed, the MSA utilizes the word "shall" over 150 times. For instance, in § 1.6 the MSA states

that "[u]pon completion of the Work, Subcontractor *shall* immediately, but under no

circumstances more than 24 hours after the completion of the Work, remove all trash and

debris." (*Id.* § 1.6 (emphasis added).)  Similarly, Article 4 of the MSA, entitled

"Commencement & Completion of Work" states that "[t]he Work *shall* commence and be

completed within the times and dates specified in the Work Order." (*Id.* § 4.1 (emphasis

added).)

In contrast, the MSA is utterly bereft of the phrase "shall have," which would incorporate

its provisions to past work or agreements.  Had the parties intended to include past work, they

readily could have added language plainly doing so.  They did not.

13

The MSA's repeated use of the word "shall" in reference to future work, and its lack of any references to past work, indicate that the "parties intended what the written instrument plainly declares:" the MSA applies only to future work. *Meade*, 311 S.E.2d at 104.

**2.    The MSA Did Not Incorporate Prior Contracts Between Marathon and Certa Pro**

Second, the plain language of the MSA does not cover or otherwise incorporate the prior work Certa Pro performed for Marathon in Texas. The MSA did not incorporate prior contractual documents, such as the Painting and Cleaning Contracts, that serve as the basis of Certa Pro's Texas Lawsuit. This clearly demonstrates that the Parties did not intend to include prior contracts in the MSA. In Section 2 of the MSA, the Parties agree that:

> [t]he Contract Documents will consist of the [MSA] including any attachments or exhibits thereto, any Work Order(s) issued by [Marathon], including any attachments or exhibits thereto, the Prime Contract (as defined in the work order) between the Owner (as defined in the Work Order) and [Marathon], including drawings, specifications, and other documents forming or by reference made a part of the Prime Contract between [Marathon] and the Owner and any changes or amendments thereto that may be made after execution of this [MSA], all of which shall be considered part of any Work Order by reference, as if fully set forth therein.

(MSA § 2.1.) Marathon claims that this section incorporated previous contracts between Marathon and Certa Pro, but that position does not square with a plain reading of the MSA. The MSA contemplates "Work Order(s) issued by [Marathon] . . . the Prime Contract (as defined in the work order) between the Owner (as defined in the Work Order) and [Marathon]." (*Id.*) This provision, like other sections of the MSA, clearly contemplates future work orders. It does not specify the number of work orders between the Parties, and refers to the "Work Order(s)" in general, rather than specific, terms. (*Id.*) Furthermore, the contracts for previous work, such as the Painting and Cleaning Contracts contain no reference to a "Prime Contract" or an "Owner" as the MSA provides the applicable work orders would. (*Id.*; *see also* Painting Contract;

14

Cleaning Contract.) In short, the MSA contains no indication that the Parties intended its terms to cover the previous Painting and Cleaning Contracts.

In contrast, the MSA does expressly incorporate several documents by reference, including "Exhibit A[:] 'Subcontractor's Certificate of Insurance'" and "Exhibit B[:] 'W-9'" form.[15] (MSA § 1.2.) Reading the contract as a whole and gathering meaning "from all its associated parts," *Seaboard*, 315 S.E.2d at 845, the MSA's express inclusion of other outside documents, but not other written, contractual agreements between the Parties, demonstrates that the Parties did not intend the MSA to replace or supersede those previous contracts.

### 3.    The Insurance Provision of the MSA Demonstrates That the MSA's Terms and Conditions Applied After, Not Before, Its Enactment

Third, the plain language of the insurance provision shows that the MSA applied only to future work. Under the "Insurance" section of the MSA, the Parties agreed that Certa Pro:

> *shall at all times during this Master Subcontract* and any extension or continuation of, at its sole cost and expense, obtain and maintain the following policies of

---

[15] Marathon unpersuasively asserts in its Memorandum in Response to the Motion to Dismiss that:

there were multiple contractual documents that formed the total subcontractor package: 1) A Painting-Scope of Work & Pricing Agreement ("Painting SOW" attached as Exhibit 1) signed by [Certa Pro] on May 24, 2017; 2) a Cleaning Scope of Work & Pricing Agreement ("Cleaning SOW" attached as Exhibit 2) signed by [Certa Pro] on August 2, 2017; [3)] a W-9 signed by [Certa Pro] and submitted to Marathon in 2017 (attached as Exhibit 3); [and, 4)] a Certificate of Insurance ("COI" attached as Exhibit 4).

(Mem. Resp. Mot. Dismiss 3.) But the MSA does not include any indication that the Painting or Cleaning Contracts formed part of its terms. The MSA refers only to "Work Order(s) issued by [Marathon]" in general terms, (MSA § 2.1), and lists the W-9 and the COI as the only documents incorporated by reference, (*id.* § 1.2). Without any basis in the MSA or other supporting factual allegations, Marathon's statement that the previous Painting and Cleaning Contracts formed part of "the total subcontractor package" constitutes an unsupported and "naked assertion" concerning the MSA's terms insufficient to give rise to a plausible claim to relief. *See Giacomelli*, 588 F.3d at 193.

insurance naming Marathon . . . its fellow officers, partners, agents, and employees and the Owner as additional insureds thereunder . . . .

(MSA § 20.1 (emphasis added).)

First, Marathon's proffer that the MSA applies to past contracts reveals an obvious difficulty. If the MSA applied to prior work—and thus had effect before September 22, 2017—then the Parties would be unable to determine the date on which the MSA, or any insurance policies, would need take effect. But the MSA specifies no backdate, implying that the MSA would be effective only from the date the Parties signed it.

Second, as to insurance, the MSA specifies the types of insurance required under its terms, including a requirement that the insurance "shall be obtained from reputable insurers licensed to do business in the state where the property is located." (*Id.* § 20.2.)

Looking to the plain language of the "Insurance" provision, the Parties plainly state that Certa Pro will hold insurance "at all times during this Master Subcontract." (*Id.* § 20.1.)  If the MSA applied to previous dealings between the Parties, however, this provision requiring Certa Pro to hold insurance could be inapplicable and extraneous.  Marathon could not require Certa Pro to have insurance before September 2017 if it, in fact, did not have insurance then.[16]  Certa

---

[16] Certa Pro did provide a Certificate of Insurance ("COI") to Marathon for the purposes of the MSA, indicating that Certa Pro had insurance coverage from March 2017 to March 2018. (*See* COI.)  Marathon argues that this document demonstrates the Parties' intention for the MSA to apply to past work, as the COI appears to cover the time period during which Certa Pro performed work for Marathon. (*See* Mem. Resp. Mot. Dismiss 3.)

But this argument does not persuade.  The language of the insurance provision is plainly forward looking, and as identified above, Marathon could not require Certa Pro to acquire insurance it did not have in the past.  The fact that Certa Pro *did* have insurance does not control. Notably, Certa Pro providing the COI to Marathon at the time of the execution of the MSA comports with this Court's plain reading of the MSA because the COI also demonstrated that Certa Pro had liability insurance for the six months *following* the execution of the MSA.

Pro either had insurance during the time-period when it performed the previous contracts, or it did not.

Reading the "contract as a single document," the insurance provision of the MSA further demonstrates that the Parties did not intend the MSA to apply to work that Certa Pro had already completed for Marathon. *Seaboard*, 315 S.E.2d at 845.

**C.     Because the MSA Applied Only to Future Work, Marathon Cannot Sustain a Claim for Breach of the Forum Selection Clause Even Considering the Cases It Cites**

Because the MSA did not apply to or alter the previous contractual dealings between Marathon and Certa Pro—including the Painting and Cleaning Contracts—Certa Pro did not breach the MSA when it filed suit in the Texas Court to recover payment for those services. The MSA's forum selection clause states that the "jurisdiction of any dispute arising from this [MSA] or the prosecution of the work will be found in the Commonwealth of Virginia." (MSA § 28.3.) Marathon has not shown that the Painting and Cleaning Contracts, or any of the previous work performed by Certa Pro for Marathon, arose from the MSA or "the prosecution of the work" as defined in the MSA. (*Id.*) Therefore, the plain language of the forum selection clause did not bar Certa Pro from filing the Texas Lawsuit, and Marathon cannot sustain its claim for breach of contract in Count I.

Marathon does not make any substantive factual assertions, outside the terms of the MSA, that the MSA barred the Texas Lawsuit. Nonetheless, straying from the text of the contract, Marathon makes two legal arguments that the MSA applied to the previous work conducted by Certa Pro for Marathon. First, Marathon claims that the Supreme Court of Virginia's decision in *Richmond Fredericksburg And Potomac Railroad Co. v. Sutton Co.* mandates a different result. *See* 238 S.E.2d 826, 830 (Va. 1977). Second, Marathon asserts that

a forum selection clause may apply to previous contractual dealings between parties, even where the contract containing that forum selection clause does not explicitly reference those previous dealings. Neither argument prevails.

### 1.    The Supreme Court of Virginia's 1977 Decision in *Sutton* Is Inapposite

Marathon contends that, under Virginia law, a judgment in favor of one party's interpretation of a contract is inappropriate where "reasonable men [or women] could reach different conclusions as to whether the parties intended the blanket contract to cover projects." (Mem. Resp. Mot. Dismiss 4 (citing *Sutton*, 238 S.E.2d at 830).)[17] But *Sutton* is inapposite for two reasons: (1) the lower court in *Sutton*, in a materially different procedural context, evaluated an ambiguous contract by taking evidence from both parties who sought to establish a course of dealing to demonstrate intent; and, (2) even were the Court to undertake that analysis, the plain language of the MSA establishes that reasonable men or women could not "reach different conclusions as to whether the parties intended the [MSA] to cover" the two College Station projects between Marathon and Certa Pro. *See Sutton*, 238 S.E.2d at 830. It did not.

In *Sutton*, the parties—a railroad company and a contractor—executed "blanket contracts" at the start of each year in order to avoid the "burdensome" process of subjecting every construction project to a new contract. *Id.* at 827. The blanket contract, however, provided that it would not apply to work exceeding "$1000.00 per agreement." *Id.* at 828. The parties in *Sutton* disputed whether a new project, undertaken after they agreed to the blanket contract for 1973, fell under the terms of the earlier-endorsed blanket contract. *Id.* Of particular relevance, after a train derailment occurred, the railroad company drafted another contract

---

[17] The Court has included the full citation from *Sutton*, as referenced in the Memorandum in Response, for clarity.

18

describing the new (but already begun) project. In the newly-drafted contract, the railroad

sought to backdate the entry of that more than $16,000.00 project to a date before the derailment,

all while placing it under the umbrella of the blanket contract "for double assurance . . . that

[they] were covered." *Id.* at 829. The contractor declined to sign the backdated contract. *Id.*

After evaluating the course of dealing evidence, the Virginia Supreme Court reversed summary

judgment in favor of the railroad with instructions to send the issue of intent to a jury. *Id.* at 830.

Procedurally, in *Sutton*, the Virginia Supreme Court did not reverse the lower court's

finding that the contract between Sutton and the Railroad was ambiguous. This Court has found

the opposite: the plain language in the MSA establishes that it was intended to apply only to

future contracts. The relevance of *Sutton*, then, is limited at best. The course of dealing

evidence is unnecessary and improper to weigh here. However, even entertaining the type of

analysis undertaken in *Sutton* (because both cases involve seemingly "blanket contracts") *Sutton*

offers no support to Marathon.

Simply put, reasonable minds could not "reach different conclusions as to whether

[Marathon and Certa Pro] intended the [MSA] to cover [the previous] projects." *Id.* at 830. The

MSA clearly does not cover them. Marathon has not pointed to any portion of the MSA, nor

made any *factually supported* allegation, that the MSA applied to the work Certa Pro previously

completed for Marathon. In contrast, the presence in *Sutton* of a new contract, drafted by the

railroad "for double assurance . . . that [they] were covered" after the fact, but then rejected by

the contractor, led Virginia's Supreme Court to hold that reasonable minds could differ as to the

scope of the blanket contract. *Id.* at 829.

Here, Marathon proffers no such factually supported allegations to support its claim that

the MSA covered previous dealings between the Parties. And the Court has found otherwise

19

based on the MSA's plain language.   Even viewing Marathon's well-pleaded factual allegations

favorably and making all reasonable inferences in favor of Marathon, reasonable minds could not

"reach different conclusions as to whether the parties intended the [MSA] to cover [previous]

projects." *Id.* at 830.   Therefore, because Marathon does not raise any factual allegations that the

MSA applied to the prior contracts or "plausibly give rise to an entitlement to relief," *Iqbal*, 556

U.S. at 676–79, *Sutton* does not preclude this Court from dismissing Count I.

### 2.    The United States District Court for the Eastern District of Virginia's Decision in *Beatgasm* Also is Inapposite

Marathon cites *Beatgasm, LLC v. Punchkick Interactive, Inc.*, No. 2:14cv611, 2015 WL

4394260, at \*5 (E.D. Va. June 25, 2015) for its position that a similar forum selection clause has

"been held to apply to claims concerning events that took place prior to a contract's execution,"

(Mem. Resp. Mot. Dismiss 3).   But *Beagasm* does not stand for the broad proposition that a

forum selection clause may apply to unrelated "claims concerning events that took place prior to

a contract's execution," as Marathon asserts.   (*Id.*)

In *Beatgasm,* the United States District Court for the Eastern District of Virginia enforced

an unambiguous and exclusive forum selection clause in far more limited circumstances.   In that

case, a party brought a claim for breach of contract alongside four other claims alleging its

business partner had engaged in several instances of fraud or misrepresentation regarding timely

performance when negotiating the contract.   *See Beatgasm*, 2015 WL 4394260, at \*5 n.7.   When

granting the motion to transfer, the *Beatgasm* court enforced the forum selection clause despite

the fact that four of the claims related to conduct that occurred before the contract's formation.

The *Beatgasm* court concluded that the forum selection clause was "broad enough to reach

claims alleging misrepresentations made *during the week preceding the Contract's execution*

regarding Defendant's capacity to perform under the soon to be executed contract" when evaluating a claim for fraudulent contract *formation*. *Id.* (emphasis added).

In other words, the forum selection clause in *Beatgasm* was broad enough to apply to a claim that the contract itself was procured by fraud just prior to entry. *Id.* The *Beatgasm* court did not suggest that a forum selection clause may implicitly replace or supersede the terms of previously agreed to contracts between parties. *See id.* Marathon does not cite any case or legal principle for the novel proposition it advances here: that a contract may control the terms of a previous contract—and previous contractual dealings between two parties—without the Parties manifesting that intent in the plain language of the contract.

Because Marathon does not assert fraud or misrepresentation on the part of Certa Pro in the weeks leading up to the MSA's alleged enactment, *Beatgasm* bears no relevance to the case at bar and does not preclude the Court from dismissing Count I.

## D. Because Marathon Makes No More Than Conclusory Allegations That the MSA Covered Previous Dealings Between the Parties, the Court Must Dismiss Count I

Juxtaposed against the plain language of the MSA, Marathon's bare assertions that the MSA precluded Certa Pro from filing the Texas Lawsuit are "no more than conclusions, [and] are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679. Accordingly, even reading its well-pleaded allegations in a favorable light, Marathon has not plausibly shown that Certa Pro undertook "a legally enforceable obligation" to resolve all prior contractual disputes through the MSA's forum selection clause. *Hardnett*, 204 F. Supp. 3d at 860 (internal citations omitted). Marathon therefore fails to state plausible facts to meet the first element for a breach of contract claim under Virginia law. The Court will grant the Motion to Dismiss as to Count I for failure to

state a claim pursuant to Rule 12(b)(6). The Court now turns to Marathon's breach of contract claim for engaging in unauthorized communications in Count II.

## V. Analysis:  Unauthorized Communication

The Court will also dismiss Count II. In Count II, Marathon claims that Certa Pro breached the MSA when the District Clerk of the Texas Court issued the Writ of Garnishment to CLS Inc., one of Marathon's customers. (Compl. ¶ 25.) Marathon asserts that the District Clerk's message constituted an "unauthorized communication" from Certa Pro to one of Marathon's customers. (*Id.*; MSA § 22.3.) The Court need not address this argument in depth because: (1) it falters on the same grounds as Count I; and, (2) it is barred by the plain language of the MSA.

First, Marathon's breach of contract claim for an unauthorized communication founders on the same grounds as its claim for breach of the forum selection clause. Specifically, because the Texas Lawsuit did not violate the MSA, the Writ of Garnishment, seeking to enforce the judgment in the Texas Lawsuit, also could not violate the MSA. Under any other interpretation, the MSA would allow Certa Pro to sue Marathon in Texas Court, but forbid Certa Pro from collecting on that judgment. Indeed, Marathon candidly concedes in its Motion to Dismiss "that if the [Texas] judgment was not obtained by breaching the contract, then the action of using the Clerk to contact Marathon's customer would have been legally allowed." (Mem. Resp. Mot. Dismiss 10.)

Second, even if the MSA were to apply, the plain language of the MSA runs counter to the argument Marathon advances. Marathon's claim to relief is barred by the plain language of the MSA. The MSA states that Certa Pro:

> agrees that it will not engage in non-authorized communications with any Owner
> or its shareholders, partners, members, directors, employees, or agents and

acknowledges that any such communication, whether written or oral, constitutes a default and may result in [Marathon] terminating this Master Subcontract pursuant to Article 14.

(MSA § 22.3.) Under the plain language of the MSA, Certa Pro did not "engage in non-authorized communications" with any of Marathon's customers:  the District Clerk of the Texas Court sent the Writ of Garnishment to CLS Inc.  (*Id.*)  Marathon complains only about the Texas Clerk's communication:  it does not allege or otherwise indicate any other unauthorized communication from Certa Pro to one of Marathon's customers.

Because Marathon concedes that Count II relies on Count I, and the plain language of the MSA bars Marathon's interpretation, the Court will grant the Motion to Dismiss as to Count II for failure to state a claim pursuant to Rule 12(b)(6).

### VI. Conclusion

For the foregoing reasons, the Court will grant the Certa Pro Motion to Dismiss.  (ECF No. 15.)  The Court will also deny Marathon's Motion for Default, (ECF No. 21), and Marathon's Motion for Hearing, (ECF No. 25).

An appropriate order shall issue.

/s/

M. Hannah Lauck
United States District Judge

Date: 6/23/20
Richmond, Virginia